Thank you, Your Honours. Jonathan Stern of the Rosen Law Firm, on behalf of Plaintiff Appellants Edmund K.L. Till, Maurice O'Keefe, and Patrick McCormick. Appellants filed a second amended complaint that alleges that investors were damaged because SMIC's share price fell after James Mulvenon of SOS International issued a detailed report that identified numerous ties between SMIC and the Chinese military. Mr. Mulvenon is an experienced China analyst who has been retained by the DOJ as an expert on Chinese industrial espionage in at least three cases. The SOS report revealed that SMIC's claims that it did not sell to Chinese military users were untrue, that Chinese military universities designed chips for SMIC to manufacture, and that SMIC's own chairman met with senior leaders of the Chinese military-industrial complex. The complaint shows... Sorry, can I just ask, was the SOS report public at the time that the Wall Street Journal article reported on it? I believe it was publicly available, but it wasn't widely disseminated. So is there anything in the record that says it was publicly available? Well, the Wall Street Journal seems to have had access to it and access to its contents. But is there anything that suggests that investors who wanted more information about that report because of what they read in the Wall Street Journal could find the report and read more? No. So the corrective disclosure, then, that you're relying on is the journal, and I guess the Reuters article later, but the journal description of the SOS report, not the SOS report itself? Yes, yes. And then the article is more equivocal than the SOS report, right? The article says other experts are skeptical of this or something to that effect. Yes, the article is more equivocal. The article mentions that other experts are skeptical of it, but it does mention that this report was issued. It mentioned that it was circulating widely among senior government officials, and then ultimately there were subsequent disclosures revealing that the government had acted on this report. But so just looking at the Wall Street Journal article for a moment before we talk about the later things, do you have a case where the supposed statement that corrected the earlier falsehood is so equivocal? I don't know that there's been really a case equivalent to that where there was an article that came out that said, hey, this expert is saying this, and then other experts have called it into question. I don't know that there's any case that sort of ruled on it. And so what's your best argument that that should be enough? Well, what I would say is, you know, it often happens that you'll have, so for instance, in the case of short sellers, one short seller will issue a report, you know, one analyst will issue a report saying, hey, I think this company is a fraud, and the stock price will drop as a result of this short seller report. But then other analysts might come out and say that, no, no, this is fine. There's no fraud there, and have responses to it. But just the unusual thing that happened here is that it was all in one single document, which was the same source, and so that it was all condensed into this one document versus different analysts. Sorry, maybe I don't know enough about this area of law to know, but when there are different analysts saying different things, is that enough for loss causation? I think usually it is taken as enough for loss causation that there was a short seller that put out a report. And it's not always if the short seller is just rehashing publicly available information. But there's case law saying that if a third-party analyst, you know, that it's sufficient for loss causation, if a third-party analyst makes a corrective disclosure. And in a situation where other third-party analysts are saying the opposite, can you point to a case where that was enough for loss causation? I mean, I'd have to look through it because I'm not sure that there was a case that specifically addressed that issue. Just, you know, as it happens normally when you have these sort of cases where a short seller comes out with a report, obviously there's going to be responses to it. Certainly there's cases where, you know, just in the normal course of things in markets, you know, people tend to debate these things. So if we said, you know, it would only be allowed if there was a third-party source that no one disagreed with, in practice that would gut the rule because, you know, probably defendants would be able to find cases, you know, someone else who said, no, no, no, there's no smoke, you know, there's no fire here, there's just smoke. So I think just as a practical matter, it tends to be out there. I'm not sure, I'm not aware of any case that specifically addressed that issue, though. What's the significance of the fact that the journal article also has, you know, a lot of statements that, also a lot of descriptions of sort of, you know, general political considerations, you know, that the administration is, you know, more skeptical of China now and, you know, maybe going to make more aggressive moves. You know, we might think that that would affect the stock price, right, quite apart from the revelation of any false statement. So when that's all mixed together in one article, doesn't that undermine the inference that the piece of it that you're describing as a disclosure was what caused the loss? Sure. And what I would say is that that issue, while it would be certainly a valid factual issue for defendants to raise, I'm not sure that the motion to dismiss would be the best place to raise it because what I would say in response, and, you know, if we were to, say, take this case to summary judgment or trial, is we'd have an expert saying, no, it was already known before this Wall Street Journal article came out that, in general, Donald Trump was taking an aggressive stance against, you know, Chinese companies and that, you know, he was sort of- But didn't the article say it was getting more aggressive? I mean, wasn't the article reporting a change? I mean, the change that they were reporting was that they were considering issuing these sanctions against SMIC. And so I don't know that you could disaggregate the-to the extent that the additional, you know, the additional aggressiveness or the additional, you know, assertiveness of the Trump posture, to the extent that that incremental change is there, I don't know that you could separate that part of it from the fact that they received the SOS report and are now looking at SMIC. And, you know, again, we could look at, was there an article the previous day that reported on the Trump administration getting more aggressive, but not mentioning the SOS report, and see what that did to SMIC stock price. So I think that, you know, the sort of thing that could be a battle of the experts looking at all the news that's out there. So, I mean, the article says the Trump administration has taken an increasingly broad approach to its use of the entity list. That doesn't sound like it's only about this company. Sure, but, I mean, it's not necessarily- I guess the question would be then, and it would be a factual question, is that component, the fact that he's been-the Trump administration has been taking an increasingly aggressive approach to the entities list, is that new news? And it's not something that we sort of, you know, we necessarily pled, because, you know, it's difficult to plead a knight. You know, we didn't necessarily consider it required under the, you know, the standards for pleading law accusation, that that particular thing that we might have to disaggregate was already out there. And so what I would say is it would be a factual question of, was that information that the Trump had been, generally speaking, taking an aggressive-more aggressive stance towards the entity list, had that been reported on, you know, prior to this report? Because if that had been reported on prior to this report, we could, you know, we could disaggregate it. Another way we could show is, for instance, if other Chinese companies that might be potentially subject to the entities list but weren't mentioned in this report or in the Wall Street Journal article, say if there was an article, you know, if we could look at those stock prices and say, look, SMIC stock price fell even compared to other companies that weren't mentioned in this report, you know, that you would generally be worried about the Trump administration's aggressive response. We could look at their-you know, we could isolate the company- But you don't think you needed to say in your complaint the other companies' stock prices didn't go down after this article? Right. I don't think there's any case law saying that we need to allege a company-specific return compared to the other companies, you know, compared to other companies that were sort of in the same sector or potentially subject to the same thing, you know, that would really require expert testimony. And I don't think there's any case law saying that you really have to distinguish, you know, basically allege the company's- Can you point to any case where the article that supposedly revealed the falsehood also talked about things about the industry in general? I don't know that there's any case where it specifically came up. I think usually when there's-you know, usually the focus is just on what did the article reveal about the company. And so I don't know that there's any case again. So this is kind of different because intuitively it might just cause a lot of companies' stocks to drop. And so it seems like you might need to allege more to defeat that, right? I think in that case, I mean, it's-I guess what I'd say is-I guess, I mean, again, you know, because the law is only subject to the plausibility standard and we're drawing all favorable inferences in favor of the plaintiff, I think even under the heightened standards of the PSLRA, having to disaggregate the returns from other industry-you know, from other industry companies would sort of go beyond what's necessary in the pleadings. Sure, I mean, I absolutely agree this is an issue that should come up at some point, but we think that would be an issue-really would be an issue of fact, not necessarily what's necessary in the pleadings. And it's also not an issue that defendants raised in opposition. And had they brought that up and had the court dismiss in the first instance on that specific ground, we could have alleged that in an amended complaint. Can I ask you about the post-class period disclosures? Starting with the EO in June 2021, as I read the complaint, there's no allegation of what happened to the stock price after that disclosure, is there? Yeah, so SMIC had been barred from trading in the United States in June of 2021 or had been barred well before that. So U.S. stocks just weren't trading for SMIC. Okay. I mean, doesn't that-I mean, I thought that the-you know, in Lloyd we said, like, if you're going to rely on the post-class period disclosures, you know, the way that you can show that they're relevant is by saying, well, that information must already have been known because when this came out, it didn't affect the stock price. And so if you can't-you know, maybe it's not your fault that you don't have that data, but if you can't show that, then how can you rely on that disclosure? Sure. Well, we do show that the-I mean, I suppose what we-I mean, I suppose what we could do- I mean, I suppose the question is, is it necessary in a case where the stock price couldn't have moved for reasons other than, you know, the information was already impounded? And I just don't-I guess Lloyd didn't really reach that issue. But the whole point of talking about the later things is to say the stock price change had already happened. We can tell that because the stock price change didn't happen further. So without the second part of that, I don't know how it's relevant at all. In that case, what I would point to is that the December-there was the December disclosure of the further action taken, and that does mention the drop in price in Hong Kong that was relatively small. So it does show that most of the information had already been impounded. So I think you can- Was that-I wondered about that, too, because your class is people who bought the ADRs, right? So had the ADRs already been barred from trading by December? The ADRs had not already been barred from trading by December. That was the order that was going to bar them going forward. But-and this is something, again, that we could probably show in discovery, in expert discovery, is that there's usually a correlation between how the prices are going in Hong Kong and how the prices are going- Well, I mean, it seems logical that there would be some correlation. Maybe not a perfect one, but don't you need to allege that? I mean, like when-the class is about people who bought ADRs, and if you're going to rely on some other data, doesn't there need to be an allegation, at least, that there's-that we can infer from what happened in Hong Kong that the same thing would have happened with the ADRs? I mean, I guess that's a question of whether that would be necessarily a pleading matter or a proof matter. And if the court could just infer, you know, if it renders it plausible that, you know, that it didn't affect the stock price, then, you know, just as a matter of common sense, then I don't know that it needs to specifically be alleged. But it's a little odd that it's missing from the complaint. I mean, if there was an answer to whether the ADRs went down or not, why don't we know it in the complaint? Amy, if we were given an opportunity to amend-and, you know, if the court had dismissed that issue and given us the opportunity to amend, we would have included that information more specifically. And what is the information? I don't have that in front of me. I believe that-I don't have the information right in front of me, so I don't want to quote the stock price and that ADR movement on that. But in the absence of that, why aren't we-I mean, I guess you're saying we take an inference from the Hong Kong price. But it seems like in the absence of that, we're almost in the same situation as June, right? Yes. But, I mean, if the court would like us to submit that information, we can happily supplement the record with that information. If you want to save time for rebuttal, unless anyone has more questions. Thanks. May it please the Court, John Schreiber of Winston & Strawn on behalf of Semiconductor Manufacturing International Corporation. Let me start by saying that a decision here that the operative complaint adequately pleaded loss causation or scienter, let alone both, would be a major outlier in this circuit and every other circuit. As the court is well aware, securities fraud claims are subject to heightened and exacting pleading requirements. That goes for loss causation as well, especially for scienter. As this court has explained, though not impossible, this is not an easy standard to comply with. It was not intended to be, and plaintiffs must be held to it. That was the Schundemann decision from 2016. This court has also said that in few other areas are motions to dismiss for failure to state a claim upon which relief can be granted so powerful. That's Ron Coney from 2001. And it's no surprise, as Cornerstone Research reports annually, that roughly 50% of federal securities fraud complaints are dismissed. So there's nothing unique or novel. And here the district court identified two alternative bases for dismissal in accordance with Ninth Circuit law. I'll address both. I think the court's only discussed with Mr. Stern loss causation so far, so I will start there. A couple of points right off the bat. I'm glad it was clarified that the corrective disclosure here is the Wall Street Journal article from September 6, 2020, not the SOS report itself. There's no allegation that the SOS report was publicly available at that point or at any point during the class period. I don't believe it was. There's certainly no allegation to that effect. And the Wall Street Journal article, as the panel has pointed out, it's equivocal. It's also indefinite because it talks about what the Trump administration is considering doing. It's evidently got this report, and it's considering whether to impose export restrictions. So it's equivocal. You've got other experts casting doubt on it, suggesting that the SOS report's allegations vis-à-vis SMIC are tenuous, that there's no support for the allegation that SMIC sells directly to the Chinese military. So that's the equivocal nature of what— So it sounded an alarm. Well, certainly it's—you know, in any of these cases, it's, you know, why did the stock drop here? I think it's obvious, and it starts with the very first couple of sentences of that report, is that the Trump administration is considering imposing export restrictions, makes pretty clear that this is part of the broader trade war, tech war with China. It would be intended to starve SMIC of components. That is bad news. That's expected to make a stock price drop. And, you know, that we would submit, not that that's our burden, but that that's why the stock dropped. It's no mystery that stock prices drop on bad news, and export controls and restrictions certainly were viewed as bad news. And so is your argument basically the administration could have been doing that, whether or not it was true that they were connected to the Chinese military? Well, I think the threshold, the stated threshold for the entity list, is that there's a risk that components supplied to certain entities could be used for products provided to the Chinese military. So it's a lower threshold. I think the article suggests that the Trump administration went even further in lowering that threshold. And we're talking about not just scores, but hundreds of Chinese tech companies that were put on the entity list. So, you know, I think it's a lower threshold. It's a risk, and putting that in loss causation parlance, a risk is not sufficient here. And with respect to the- And so do we need to sort of assume the administration was acting in bad faith, though, to agree with you on that? I mean, what are we supposed to say about what that means that makes it not a false statement before when they said they were not connected to the military? I think here, no, it doesn't mean that the administration needs to proceed in bad faith. And the Biden administration continued largely with similar policies about restricting supplies to semiconductor manufacturing, as well as every other Chinese corporation. But again, even the restriction, if you look at the record, the restriction was just that suppliers would have to apply for a license. It wasn't a bar in providing supplies and components to SMIC. It was you have to apply for a license. And I think, as the court has seen from the briefing, the Commerce Department readily granted those licenses. Once that was put in place, which is the later corrective disclosure requiring the application for these licenses, the Commerce Department readily, almost across the board- So that's the document that the district court took judicial notice of, but it has- It did. It has many caveats in it saying, don't rely on this for anything. I mean, I'm not sure we can rely on it for anything when we take it at its face. I don't think it does have that many caveats. I know that's how it was cast by plaintiffs' counsel here, but it's actually identified as an explanatory statement about what is there. I think there was a suggestion that these are necessarily inherently innocuous components. That's also not the case, nor is it suggested by this. There are five categories of items that these licenses would apply to, and it didn't apply to all items. So not all supplies to SMIC were required. You didn't have to have a license. So it was only things that ostensibly might be used for the production of semiconductors provided to the military, innocuous items. I mean, it says a lot of things, like for a number of reasons, even in aggregate form, the licensing information being authorized for public disclosure is of limited utility to Congress. I mean, there are all these caveats in this document all through it. This hasn't been edited. It doesn't express the views of anyone. I mean, how are we supposed to take this as anything? Well, again, this is submitted. If plaintiffs want to point to post-class period developments, and this court is required to do a balancing under TELABS for purposes of CNTER about the inferences that can be drawn here, you don't have any of the badges of securities fraud. Of the types of things you see in nearly every securities fraud case, at least one of the following, you'll have alleged insider sales at suspicious times. You would have an admission by the company, either during the class period or sometime after. You would have allegations sourced to insiders, such as this would happen in the BFI case on which plaintiffs rely. There you had an auditor who was an employee of the bank who filed a whistleblower complaint that was credited as being highly detailed and specific, and he was in a position to know. You have all of those things in the cases where complaints actually survive a motion to dismiss. You have none of that here, and so if plaintiffs want to point to post-class period developments, we talked a little bit about the executive order from the Trump administration in November. It doesn't mention SMIC specifically. SMIC ADRs were still trading at the time. The price was actually going up. That's why the class period ends when it does, because the price of SMIC ADRs rises post-class period. And if you're going to look at any of the post-class period developments, we submitted this just to sort of counter any suggestion that post-class period. We think post-class period is basically irrelevant here, but if you are going to look at post-class period developments, you never have a definitive statement from the U.S. government that SMIC, let alone singling out SMIC. Can I ask you about something in your brief? So you acknowledge on page four of your brief that at the motion to dismiss stage, you have to take the factual allegations of the complaint as true, and then on page five, you say as to SMIC, it does not manufacture semiconductors for or provide services to the Chinese military. Isn't that exactly the opposite of what the complaint alleges? And, in fact, the paragraph you cite says they lied when they said this, and then you quoted the part after the they lied when. How is that not an unethical inclusion in this brief? I have to look specifically with the way we stated it, but I think we are noting that, you know, plaintiffs are pointing to SMIC statements, and I do think it's relevant if you're going to look at it. I mentioned that there's no admission by SMIC. I think it's relevant as part of the mix here that SMIC denied it. So plaintiffs allege SMIC had made statements that it did not sell components to the Chinese military. Plaintiffs allege otherwise the SOS reports. But you don't say here SMIC has always contended that it doesn't manufacture. It's always maintained that. You say it does not manufacture semiconductors for the Chinese military, which is the opposite of what the complaint alleges. Okay. I apologize if that was somehow misleading. You know, we are quoting the complaint. That is certainly what SMIC maintains, and it is our position that the allegation to the contrary is not accurate, but it's more important for this stage that it's not adequately alleged. They have not adequately alleged that that is ever revealed to be false, and I think there are plenty of places in the brief and in the complaint where it's clear that that is SMIC's position, and as stated by us, that is its position. So I apologize to the court if that was somehow viewed as misleading. But in this context, I do think it's relevant that that is SMIC denied it. You have a lot of cases where the company admits via a restatement or some other vehicle admits that its prior statement was false. I think it's relevant that SMIC has never done that. It continues to maintain that it does not sell to the Chinese military. You don't have any insiders via confidential witnesses, whistleblowers who say otherwise. You don't have a definitive statement from the U.S. government that that's not true. And if anything, if you are going to look at post-class period developments. Do you think we would have to have admissions from insiders in this kind of context, or could the government be enough? I mean, I know you say the government is just saying it's a risk, but if the government said we have intelligence, they are producing semiconductors for the Chinese military, would that be proof that your earlier statement was false? I think that might get you there. I think it's all a matter of what does the mix look like. The corrective disclosure here is the Wall Street Journal article that says the Trump administration is weighing what to do, whether to impose additional restrictions. Again, those restrictions are simply requiring a license. It's not barring supplies. That's what the Trump administration is doing. There's one side alleging that there are these connections to the Chinese military. There are other experts saying that that's not the case. So that's a different situation. That's the corrective disclosure here. If what you had was a definitive statement by the government coming out and saying, we have concluded, we've been investigating this, we've looked into it, and we've got serious proof that SMIC is selling directly to the Chinese military, I'd have to say that probably gets you there. The plaintiffs say that the use of the term risk is a term of art that comes from the statute and that it really means we know. What is your response to that? What matters for purposes of law scholarsation is what the market hears and what the market interprets. Well, that's what I understood their position was, that that's the way the market would interpret it. I'm not sure that that's plausible. I mean, I think risk means risk, that they've identified a risk. And I think what flows from that risk is that suppliers now have to seek a license. If it was really a definitive conclusion that SMIC is producing semiconductors for the Chinese military, wouldn't the government just cut it off and say, no, nobody is supplying anything to SMIC? If what flows from that is, first, we're considering whether to impose this restriction, and then when we finally do it, all it requires is this application for a license, and then the government proceeds to grant all of those licenses, I don't think you can draw that conclusion. Can I ask you to address the scienter? So the complaint has a whole bunch of allegations about senior people at the company have various ties to the party and the PLA. Why isn't it reasonable to infer from that, assuming they've shown falsity, that these people would have had to know, and therefore we should infer that the statements were deliberately false? For purposes of scienter, what they've alleged is tours of SMIC's facilities by a bunch of folks, at least what I can tell from the complaint, are not Chinese military. They're certainly Communist Party and they're part of the government. These are public meetings. There's nothing sort of nefarious that I would draw from that. It happens all the time here that major corporations host politicians and provide tours. So I don't think that, and especially, again, this is all just from the SOS report, that's an outsider without the benefit of any inside sources. Mr. Stern talked about sometimes short-seller reports can be credited for loss causation. The only times I'm aware of that is when the short-seller has the benefit of somebody on the inside. They've got allegations and facts coming from inside employees. Here you don't have anybody on the inside, and I would suggest the tours of non-military folks don't add up to scienter, especially balanced against everything else in this case. Thank you. I think we've used up your time. Thank you. We still have some time for rebuttal. Thank you, Your Honors. The one thing I would note that we didn't get a chance to discuss in my opening was the September 26 disclosure, which I would say does really satisfy that Lentil standard because you have the initial drop of 20 percent and then a much smaller drop when it's confirmed that the Trump administration was acting on the SOS report. And I think even though they use the word risk, again, that is a term of art, and I think any reasonable investor would have said, well, the Trump administration must believe this report. I guess it must be true. That's the reasonable interpretation an investor would take. This report was found credible by the U.S. government, and they're acting on it. And what's the best statement in your view in the sentence in September 26 that is a contradiction to an earlier thing? Because I thought it was pretty vague. It's not in contradiction to an earlier thing, but it's a material. I mean, you don't need an exact mirror image for loss causation. So what I would say is it's confirmation. What statement in it shows that the earlier statements by SMIC were false? The United States has imposed restrictions on exports to China's biggest chip maker, SMIC. After concluding there is an unacceptable risk, equipment supplied to it could be used for military purposes. And so are you saying that risk, sort of Judge Schroeder's question, risk really means they were? I mean, it seems like they could do that and think there's a risk without it having been false back in May that they said they weren't. I think because the statute refers to evidence of activities creating an unacceptable risk, it's understood as a term art, and it means that the government must have found there's evidence. It can't just say, well, there's a risk because we just don't like the way they look. You know, it means that they found evidence. It's not just an arbitrary determination of risk. It's a risk assessment based on evidence. And the only thing I would ask is if the court does dismiss on grounds other than what the district court did that might be curable, that we have an opportunity to amend and remand. Thank you both sides for the helpful arguments. This case is submitted.
judges: SCHROEDER, FRIEDLAND, MILLER